# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AES Thames, LLC, *et al.*,<br>             Debtors.<br><br>CHARLES M. FORMAN,<br>Chapter 7 Trustee<br>             Plaintiff,<br>    v.<br><br>MORAN TOWING CORP..<br>             Defendant | Chapter 7<br><br>Case No. 11-10334 (KJC)<br>(Jointly Administered)<br><br><br><br><br><br>Adversary No. 13-50395 (KJC)<br>(D.I. 1) |

## MEMORANDUM[1]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Charles M. Forman, the chapter 7 trustee (the "Trustee"), filed an adversary complaint against Moran Towing Corporation ("Moran") seeking to avoid and recover two transfers as preference payments pursuant to Bankruptcy Code §547(b) and §550. Moran does not dispute that the transfers meet the requirements of §547(b), but argues that the transfers are not avoidable under Bankruptcy Code §547(c)(2) because the debtor paid the transfers in the ordinary course of its business with Moran. The parties briefed the issues and filed a Joint Pretrial Memorandum (D.I. 53), then asked the Court to decide this matter on the papers. For the reasons set forth herein,

---

[1] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. §157 and §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(F).

I conclude that the Trustee may not avoid and recover the transfers at issue because those transfers were made in the ordinary course of business between the Debtor and Moran.

Undisputed Facts

The parties agreed to the following facts in the Joint Pretrial Memorandum:[2]

On February 1, 2011 (the "Petition Date"), AES Thames, L.L.C. (the "Debtor") filed a voluntary chapter 11 bankruptcy petition in this Court. On January 23, 2012, the Court entered an order converting the Debtor's case to chapter 7. On January 24, 2012, the Trustee was appointed.

Prior to the Petition Date, the Debtor owned and operated a coal-fired power plant located in Connecticut (the "Facility"). On November 12, 2004, the Debtor entered into a Transportation Agreement (the "Agreement') with Moran under which Moran agreed to provide marine services to transport coal by vessel or barge to the Debtor's Facility.[3] The payment terms of the Agreement provided, in part, that:

> a. Freight shall be on the loaded quantity of cargo (and where applicable, deadfreight), as provided in Part I of the Agreement. Freight shall be deemed earned on loading of cargo, Vessel and/or cargo lost or not lost, and shall be paid without discount in U.S. currency.
>
> b. [Moran] shall invoice [the Debtor] on a voyage basis within ten (10) business days after loading each cargo utilizing the tonnage reported by the cargo loader's certified scales and the applicable Base Freight Rate as set forth in Part I. On the twenty-fifth (25th) day of each month, [the Debtor] shall issue payment to [Moran] (via wire transfer to such account as [Moran] may specify in writing from time to time) for all cargoes loaded during the previous calendar month. If the said twenty-fifth day is not a business day, then payment shall be made on the first business day following said twenty-fifth day.

---

[2] The Court appreciates the efforts of the parties to present a complete and particularly helpful Joint Pretrial Memorandum.

[3] A copy of the Agreement is attached as Exhibit A to the Joint Pretrial Statement (D.I. 53-1).

2

Between July 16, 2007 and September 22, 2010 (the "Historical Period"), Moran invoiced the Debtor for transportation services provided, and the Debtor paid those invoices.[4] Between October 5, 2010 and November 16, 2010, Moran sent eight invoices to the Debtor for transportation services it provided (the "Preference Period Invoices"). Pursuant to the Agreement, five of the Preference Period Invoices were due to be paid on November 26, 2010, but were paid on December 15, 2010; that is, 19 days late.[5] The other three Preference Period Invoices were due to be paid on December 26, 2010, but were paid on January 6, 2011; that is, 10 days late.[6] Moran did not take any unusual action to collect the Preference Period Invoices.

All payments made in both the Historical Period and the Preference Period were paid by wire transfer. During the Historical Period, invoice amounts ranged from $42,217.97 to $138,707.81. During the Preference Period, invoice amounts ranged from $69,340.99 to $122,995.00.

The number of invoices paid by one payment during the Historical Period ranged from one to eight invoices. The number of invoices paid by one payment during the Preference Period ranged from three to five invoices.

Pursuant to Bankruptcy Code §547 and §550, the Trustee seeks to avoid and recover from Moran the transfers made on December 15, 2010 and January 6, 2011, totaling $798,068.23 (the "Transfers"). The parties agree that Moran provided the Debtor with $445,446.43 of unpaid new value pursuant to Bankruptcy Code §547(c)(4), leaving a balance of $352,618.78, prior to application of any ordinary course of business defense under §547(c)(2)(A).

---

[4] Exhibit B to the Joint Pretrial Statement (D.I. 53-2) is a chart summarizing the invoices sent by Moran to the Debtor and payments made by the Debtor to Moran during the Historical Period.

[5] Exhibit C to the Joint Pretrial Statement (D.I. 53-3) is a chart summarizing the payments made within 90 days prior to the Petition Date; that is, between November 3, 2010 and January 31, 2011 (the "Preference Period.").

[6] *Id.*

3

Discussion

"When a debtor makes a payment to an ordinary unsecured creditor within 90 days before declaring bankruptcy, assuming that a number of other statutory elements are met, the payment will be stigmatized as an avoidable 'preference.'"[7] The ordinary course of business defense found in Bankruptcy Code §547(c)(2) provides a safe harbor for the transferee of a preference payment by precluding a trustee from avoiding it "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms."[8]

The Court of Appeals for the Third Circuit has explained that the ordinary course of business defense is designed to balance the interests of the debtor and creditors, stating:

> [T]he preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.[9]

---

[7] *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir. 1994) *superseded, in part, by statute,* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P.L. 109-8, Title IV, §409, 119 Stat 23 (Apr. 20, 2005). Despite the later amendment to §547, the Third Circuit's analysis upon which I rely for present purposes remains vital, persuasive and controlling.

[8] *Burtch v. Texstars, Inc. (In re AE Liquidation, Inc.)*, Case No. 08-13031, Adv. No. 10-55502, 2013 WL 5488476, *2 (Bankr. D. Del. Oct. 2, 2013); 11 U.S.C. § 547(c)(2) (2016).

[9] *Molded Acoustical Prods*, 18 F.3d at 219.

4

The creditor bears the burden of proving that the transfers at issue fall within the ordinary course of business exception.[10] There is no dispute that the Transfers here paid a debt that was incurred in the ordinary course of business between the Debtor and Moran. The only issue is whether Moran can meet its burden that payment of the Transfers occurred in the ordinary course of business under §547(c)(2)(A).

"The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test involving the consistency of transactions between the creditor and the debtor before and during the preference period."[11] When reviewing the transactions for consistency, a court should consider several factors:

(i)  The length of time the parties engaged in the type of dealing at issue;

(ii) Whether the subject transfers were in an amount more than usually paid;

(iii) Whether the payments at issue were tendered in a manner different from previous payments;

(iv) Whether there appears to be an unusual action by the creditor or debtor to collect on or pay the debt; and

(v) Whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition.[12]

"No one factor is determinative. Rather, the Court should consider the parties' relationship in its entirety."[13]

---

[10] 11 U.S.C. §547(g).

[11] *AE Liquidation*, 2013 WL 5488476 at *3 citing *SEC v. First Jersey Sec., Inc. (In re First Jersey Sec. Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999).

[12] *AE Liquidation*, 2013 WL 5488476, *3 citing *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 241-42 (Bankr. D. Del. 2010); *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*, 320 B.R. 541, 548-49 (Bankr. D. Del. 2004).

[13] *AE Liquidation*, 2013 WL 5488476, *3 citing *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2012).

The creditor bears the burden of proving that the transfers at issue fall within the ordinary course of business exception.[10] There is no dispute that the Transfers here paid a debt that was incurred in the ordinary course of business between the Debtor and Moran. The only issue is whether Moran can meet its burden that payment of the Transfers occurred in the ordinary course of business under §547(c)(2)(A).

"The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test involving the consistency of transactions between the creditor and the debtor before and during the preference period."[11] When reviewing the transactions for consistency, a court should consider several factors:

(i)   The length of time the parties engaged in the type of dealing at issue;

(ii)  Whether the subject transfers were in an amount more than usually paid;

(iii) Whether the payments at issue were tendered in a manner different from previous payments;

(iv)  Whether there appears to be an unusual action by the creditor or debtor to collect on or pay the debt; and

(v)   Whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition.[12]

"No one factor is determinative. Rather, the Court should consider the parties' relationship in its entirety."[13]

---

[10] 11 U.S.C. §547(g).

[11] *AE Liquidation*, 2013 WL 5488476 at *3 citing *SEC v. First Jersey Sec., Inc. (In re First Jersey Sec. Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999).

[12] *AE Liquidation*, 2013 WL 5488476, *3 citing *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 241-42 (Bankr. D. Del. 2010); *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*, 320 B.R. 541, 548-49 (Bankr. D. Del. 2004).

[13] *AE Liquidation*, 2013 WL 5488476, *3 citing *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2012).

Exhibit B to the Joint Pretrial Statement shows that payments from the Debtor to Moran during the Historical Period cover a period of more than three years, sufficient to establish an ordinary course of dealings between the parties.[14] Moreover, the parties have stipulated that Moran did not take any unusual action to collect the Preference Period Invoices.

The dispute boils down to whether the Transfers during the Preference Period are similar to the transfers made during the Historical Period. In determining the ordinary course of dealings between the parties, courts place particular importance on the timing of payments.[15] "Courts have found that small deviations in payment timing may not be so significant as to defeat the ordinariness of such payments."[16] "In contrast, courts have held greater deviations in payment timing sufficiently significant to defeat the ordinariness of such payments."[17]

---

[14] *AE Liquidation*, 2013 WL 5488476, *4 (two-year relationship was sufficient to establish an ordinary course of dealing); *Archway Cookies*, 435 B.R. at 243 (same).

[15] *Archway Cookies*, 435 B.R. at 243 (internal punctuation omitted) quoting *Radnor Holdings Corp. v. PPT Consulting, LLC*, Case No. 06-10894, 2009 WL 2004226, *5 (Bankr. D. Del. Jul. 9, 2009).

[16] *Radnor Holdings*, 2009 WL 2004226, *5 citing *In re Ice Cream Liquidation, Inc.*, 2005 WL 976935 (Bankr. D. Conn.2005) (holding that a five-day discrepancy between average days outstanding during the pre-preference period versus during the preference period did not make the payments out of the ordinary course of business); *In re Valley Steel Corp.*, 182 B.R. 728 (Bankr. W.D. Va.1995) (holding that a difference between approximately 54 days pre-preference average days to payment and approximately 67 days preference average days to payment did not make the payments out of the ordinary course of business); *In re Bank of New England Corp.*, 161 B.R. 557 (Bankr. D. Mass.1993) (holding that a difference between 38.4 days pre-preference average number of days to payment and 54.7 days preference average number of days to payment did not make the payments out of the ordinary course of business). *See also AE Liquidation*, 2013 WL 5488476, *4 (holding that change between historical average number of days to payment (49.68) and preference period average number of days (41.98) was not significant); *Archway Cookies*, 435 B.R. at 244 (holding that difference of 4.9 days in the number of days to payment in the historical period and the preference period was not material).

[17] *Radnor Holdings*, 2009 WL 2004226, *5 citing *In re Parkview Hospital*, 213 B.R. 509 (Bankr. N.D. Ohio 1997) aff'd, 181 F.3d 103 (6th Cir.1999) (holding that the increase from paying batches of invoices on average between 23 - 32 days late during the historical period to an average of 72 days late during the preference period was a "substantial deviation" from the parties' ordinary course of business). *See also Forklift Liquidating Trust v. Clark-Hurth (In re Forklift LP Corp.)*, 2006 WL 2042979, *8 (D. Del. Jul. 20, 2006) (denying ordinary course of business defense when (i) the number of days for payment of invoices shifted from an average of 97 days during the historical period to an average of 154 days during the preference period, and (ii) an increase from 58.4% of invoices paid between 61 and 90 days after invoice in the historical period to 63% of invoices paid over 120 days after invoice in the preference period).

In this matter, the parties disagree about how to compute the timing of the payments. The Debtor paid Moran based on the loaded quantity of cargo (i.e., coal) being shipped to the Debtor. Under the Agreement, Moran generated an invoice within ten days after the loading of a vessel. The Agreement further provided that on the 25th day of each month (or, if the 25th was not a business day, then the first business day thereafter) (the "Due Date"), the Debtor would pay Moran for all cargoes loaded during the previous calendar month. When analyzing the timing of the Debtor's payments, one could choose to review the number of days between the loading date and payment, the invoice date and payment, or the Due Date and payment. Moran analyzes all three, resulting in an array of numbers. The Trustee, however, argues that it is appropriate in this case to analyze only whether the Debtor consistently paid Moran on the Due Date or, if thereafter, to calculate the number of days the payment was made after the Due Date. Measuring the time from load date to payment, or from invoice date to payment, does not reflect whether the payments were timely or whether there was a consistency to the payments. I agree with the Trustee.

The Debtor made two payments to Moran during the Preference Period, and those payments were made 19 days and 10 days, respectively, after the applicable Due Date. Based on the information set forth in Exhibits B and C to the Joint Pretrial Statement, the Trustee argues that during the Historical Period the Debtor paid Moran on average 2.45 days after the Due Date, while during the Preference Period the Debtor paid Moran on average 15.63 days after the Due Date. The Trustee also points out that during the lengthy Historical Period, only 4 of 164 invoices (or 2.44%) were paid 10 days or later after the Due Date. Therefore, the Trustee concludes, the Preference Period Transfers did not conform to more than 97% of the payments during the Historical Period.

7

Moran argues in response that during the Historical Period, payments ranged between -28 (i.e., 28 days *before* the Due Date) and 35 days after the Due Date. Therefore, the range of payments during the Preference Period (10-19 days) falls within the Historical Period range.

I recognize the importance of considering the timing of payments when analyzing an ordinary course of business defense. The Trustee's reliance on the average payment statistics are countered by Moran's reliance on the range of payment statistics.[18] When reviewing the parties' payment history, a late payment of 10 or 19 days, although infrequent, is not unprecedented in the parties' relationship. Moreover, the other factors to be considered in analyzing an ordinary course of business defense all fall in favor of Moran.[19] The amount of the Transfers fell within the range of the amount of payments made during the Historical Period. The Transfers continued the Debtor's practice of paying a number of invoices together for all cargo shipped in the previous month. The Transfers, like all payments during the Historical Period, were made by wire transfer. The parties stipulated that Moran did not take any unusual action to collect on the Preference Period Invoices, and there is no evidence that Moran did anything to gain an advantage over other creditors during the Preference Period. I conclude, under these somewhat unique circumstances,

---

[18] "'[T]he Trustee's reliance on the average payment time, as is often the case with statistics, does not portray the complete picture' of the payment history." *Sass v. Vector Consulting, Inc. (In re American Home Mortgage Holdings, Inc.)*, 476 B.R. 124, 138 (Bankr. D. Del. 2012) *quoting Troisio v. E.B. Eddy Forest Prods. (In re Global Tissue LLC)*, 106 Fed. Appx. 99, 102 (3d Cir. 2004).

[19] In some cases, Courts have determined that the timing of payments along with some other factor prevent application of the ordinary course of business defense. *See Forklift*, 2006 WL 2042979 (denying ordinary course of business defense based on timing of the payments and the implementation of a payment plan during the preference period), *Burtch v. Prudential Real Estate and Relocation Services, Inc. (In re AE Liquidation, Inc.)*, Adv. No. 10-55543, 2013 WL 3778141 (Bankr. D. Del. Jul. 17, 2013) *aff'd in part, remanded on other grounds*, Civ. No. 13-1504, 2015 WL 5301553 (D. Del. Sept. 10, 2015) (denying ordinary course of business defense based on timing of the payments and evidence of collection activity), *Radnor Holdings*, 2009 WL 2004226 (denying ordinary course of business defense based on timing of payments and a change from payment of invoices in full during the historical period to payment of partial invoices in increments of $5,000 during the preference period). On the facts before me, which are stipulated to in the parties' Joint Pretrial Memorandum, the difference in timing of the payments is not so great that, without more, it should preclude application of the ordinary course of business defense.

that the business relationship between Moran and the Debtor falls within the type of relationship the ordinary course of business defense is intended to protect.

> The Court must be cognizant of a debtor's need to maintain constructive relationships with certain creditors. Thus, when a debtor-creditor relationship "has been cemented long before the onset of insolvency . . . we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business."[20]

Accordingly, I conclude that Moran has met its burden of establishing that the ordinary course of business defense applies to the Transfers. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: March 3, 2016

---

[20] *AE Liquidation*, 2013 WL 5488476, 3 *quoting Molded Acoustical Prods.*, 18 F.3d at 224-225. *See also Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 111 (Bankr. D.Del. 2010) (quoting same).